We'll hear argument next in Case 22-1238, the Office of the United States Trustee v. John Q. Hammons Fall 2006, LLC. Ms. Hansford? Mr. Chief Justice, and may it please the Court, this case presents the question that this Court left open in Segal. What the appropriate remedy is for the uniformity violation that resulted when debtors in a small sliver of cases, four dozen cases, in the two states that use bankruptcy administrators, did not pay the increased quarterly fees mandated by Congress and the U.S. Trustee Districts. As this Court has recognized time and again, the touchstone of the remedial inquiry is congressional intent. And here, there's unusually strong evidence that Congress would choose to fix the constitutional violation by mandating uniformly higher fees. That means the appropriate remedy in this case is a mandate of higher fees nationwide, either standing alone or in combination with a retrospective effort to collect the $3.8 million in fees that the B.A. debtors collectively underpaid. Now, respondents instead urge a refund remedy, which when applied nationwide, would require taxpayers to foot the bill for approximately $326 million to fund windfalls for the largest users of the bankruptcy system, like respondents, who paid exactly what Congress intended that they pay. The problem with that approach is that as a practical matter, it will actually make the disparity larger. Worse yet, it goes directly contrary to congressional intent. Congress has for decades sought to make the bankruptcy system self-sustaining at no cost to the taxpayer, and it enacted the 2017 Act's fee increase for that reason. Now, respondents' argument that the due process clause compels this topsy-turvy solution simply don't hold up. Respondents must establish both that the due process clause requires retrospective relief and that that retrospective relief must take the form of refunds, but they cannot make either showing. Respondents had a meaningful opportunity for a pre-deprivation hearing here, and the due process clause requires nothing further, and to the extent retrospective relief is required, that relief should be additional collections. I welcome the Court's questions. Do we normally look to legislative intent to determine the appropriate remedy for a constitutional violation? Yes, Justice Thomas. I think this Court's cases are crystal clear that the question, and in particular, the critical question here, which is the leveling up or leveling down question, uniform fees at the higher level or the lower level, is a question of congressional intent. What's your best example of that? I think that Morales-Santana has an extensive discussion of how congressional intent is the guiding question. Do you have any cases in which there was a monetary remedy involved? Yes, absolutely. So I think the tax cases are classic money cases, and in those cases, Levin v. Department of Commerce, McKesson, all those cases lay out that leveling up or leveling down might be appropriate. It seems that both McKesson or Reich, those cases don't support you, though. We very much disagree with that, Justice Thomas. I think those cases support us both on the prospective retrospective question, but also the leveling up, leveling down question. So first, I think those cases make clear that when, as here, there's a pre-deprivation remedy, you can have prospective-only relief. But more significantly, those cases make clear that additional collections can be the right remedy, and that's because of the nature of the violation here. The violation here is not that respondents paid a fee that Congress wasn't authorized to impose. There's no question Congress was authorized to impose the fee. The mistake here was that Congress inadvertently let the BA administrators have the option of not charging those fees, so it accidentally under-collected. Does Reich help you on the pre-deprivation relief? I think that Reich is inapposite here because it's a bait-and-switch case, but I think even in Reich, a case where there was a bait-and-switch and there was a state statute that promised a refund, but instead the state courts tried to say no refund was available, even in that case, the court left open a determination of relief consistent with McKesson, which could be leveling up or leveling down. And I think it's critical that even in those cases, which I think mainly come up in the tax context, where there is a due process requirement for retrospective relief, that relief can be leveling up. I don't think there's any dispute here that to the extent every penny of those $3.8 million is collected, respondents would be made entirely whole. They will not have been subject in hindsight to a discriminatory scheme, and I think that goes to show that their injury is not a monetary injury. Ms. Hansford, I'm troubled by one piece of this case, okay? I do agree that Kessin and Harper say if you have a pre-deprivation mechanism to protect yourself, the government can level up or down, because you should have taken advantage of your ability to protect yourself. Putting aside respondents' argument that if they didn't pay the fee here, they would have been thrown out of court, and I agree that there's examples of people who didn't pay the fee. They put the money in escrow, or some actually withheld it and didn't get thrown out. So they're assuming there's a pre-deprivation remedy, which I do, okay? And I think McKesson would control. There's a part of your argument that troubles me, and it's with the people who invoked the remedy, meaning in normal course of litigation, if you think you shouldn't pay something, don't pay it. Go to court and don't pay it, and some people did that. But now you're saying to them, you did the right thing to protect yourself from the inequality, but now I can claw back that money when I level down, or level up, I mean. To me, that doesn't seem quite right. The clawback is what's troubling me, because if you claw back, there really is no pre-deprivation remedy. You're going to end up having had to pay and continuing to pay something you thought was unequal at the time. And so there's the nub of my problem. It's the clawback. It's less the concept that you can level up or down and say that people who paid and shouldn't have, well, that's their problem. They knew that they might be paying more, or should have known they were paying more, and should have protected themselves, and they chose not to. That's forfeiture and waiver. What do I do with the clawback that you're asking for? So, Justice Sotomayor, kind of three things I want to say in response to that. First, just a small clarification, and I take that your premise is there was a pre-deprivation remedy in this case, and I think that's absolutely correct. Just as a clarification, I do think that McKesson specifically says when there is no pre-deprivation remedy, you can still level up or level down. The requirement is, in hindsight, a uniform scheme which can be level up or level down, so I really don't think the pre-deprivation question goes to which relief is appropriate. But, you know, taking the premise of your question, there was pre-deprivation relief here, I think that the right solution for everybody is the same solution that would have happened had respondents filed suit on day one under the Declaratory Judgment Act. They would have obtained a ruling that would say, yes, this is unconstitutionally ununiform, and we look at congressional intent, and congressional intent is plainly, and I think the evidence here is overwhelming, uniformly higher fees nationwide. That means the right remedy is a leveling up remedy of collecting additional fees in the BA districts, and so from day one, those BA administrators would know they have to collect the higher fees, they can't have the exception, they have to follow the Judicial Conference's standing order. I think that's the right solution in this case, and so that's why I don't think there's any reason to treat people who exercise But that goes back to the clawback, because you're saying that I accept your equality can be everybody pays equally. This whole fight is about the clawback. Who gets the clawback? Do you get a pass on trying to get the money from the people who benefited, and can you keep the fees from people who withheld it? Can you get it back from people who didn't pay or escrowed? That's the whole issue. But I think the point is that in that case, no clawback would be required, because the just prospective relief of saying everybody has to pay the higher fees would take care of it, and that was the right answer then, and I think there's no way that respondents or anyone else should be able to get more, which is payment at the lower levels that Congress never intended nationwide, because they waited. And I do think that Retrospective, I think maybe that's what we're talking about. Let's say we don't accept your argument that it's prospective. We're saying that retrospective relief is required, and the question is just whether you're leveling up or leveling down then. I take Justice Sotomayor's question to be, what about debtors like MF Global? So, Justice Barrett, I guess first, I want to say that there are five cases that we're aware of in the category like MF Global, so if you do think the answer is different as to those cases, I don't think that would have a big practical or other consequence. So, if you're concerned about that set of cases, I would really urge you not to craft a remedy for respondents here based on those cases. But I think as a conceptual matter, those cases come out the same, and if you think of the AAPC case, the Telephone Consumer Protection Act, there was a disuniform scheme, and the problem with that scheme was that there was an exception for government-debt robocallers, which is what created the disparity. But I don't think there's a question that the people who made non-government-debt robocalls before, even at the time when mistakenly the scheme was being administered un-uniformly, remained liable. They were always required to not make the robocalls, and if they did, they remained liable. And footnote 12 of the plurality makes clear that you don't need to go back in time and compensate those people for, and that's another example of a money case, Justice Thomas, that you don't need to go back and compensate those people for financial penalties or financial liability that they incurred because they were doing exactly what Congress intended. Okay, let me just ask you this. Let's assume that we disagree with you about the prospective, and we're accepting, just as I said at the beginning, that it has to be retrospective. Do you want to address the practical difficulties, like the former bankruptcy judges pointing out the practical difficulties of trying to level up here and go back and reopen these cases and extract money from the debtors in the B.A. districts? Yes, absolutely, Justice Barrett, and I think there are practical problems on both sides, and I think overall the practical problems are actually much worse with the refund remedy because it needs to be implemented in about 40 times as many cases, about 2,100 cases, instead of the 48 cases. And so how a refund would need to work is the debtor would need to come forward and request a refund, and 85 percent of those cases are closed. In some of them, the debtor continues to exist, the reorganized debtor. In some of them, the debtor has gone out of business. There may not be a way to reach that debtor. The plan may not provide what to do with excess funds. Cases may actually need to be reopened, and ironically, I think you're more likely to reopen. I think that you're missing the thrust of the question. Justice Barrett's question is how are you going to implement your remedy? On the other hand, if Mr. Geiser were to prevail, somebody would have to come forward and try and reopen, and good luck with that, all right, if they haven't preserved their arguments. And that's what you're saying, and I take that point. And so maybe a lot of people who would be entitled to won't be able to, and that's the end of it. But Mr. Geiser will be happy, and his client will be happy. On your end, I think we have to tell the Judicial Conference to go do something in the first instance. I think we have to tell the Judicial Conference, who's not a party to this lawsuit, and I know the Chief Justice has great authority over that body, but I'm not so sure about the rest of us. And what order do we issue to them? I guess is a question I have, and I think Justice Barrett's getting at, and how are they going to go do it? Who's going to go do it? And those are closed cases where, okay, it's not somebody asking for something who might lose because his case is closed and he doesn't care anymore. You have to go claw back from somebody whose case is closed. And I just haven't heard anything quite like that before. So help me out. So Justice Gorsuch, a lot of really important things in that question, and I want to get to all of them. I think to start with the first, which is as a practical matter, what would happen if this court ordered the additional collection remedy? I don't think there's anything unusual about that. I think that— Ordering a non-party to the case to take action? So to be clear, I don't think the order in this case would be an injunction to the BA districts to do that. The judgment in this case is the motion to redetermine fees is denied because respondents paid the correct level. But I think this is a problem that arises any time you have— But that's premised on the idea that a court can compel this claw back. And I guess I'm wondering, again, we've spoken a lot around it, but at the end of the day, for it to work, somebody has to order the claw back. And I think Justice Barrett's question and mine is, just honestly, I haven't seen something like that before. How does it work? So I don't think that in a leveling down case or a leveling down tax case, there's any rule that the judgment— You're talking about leveling up. Just stick with the leveling up and the remedy you're proposing. I apologize, Justice Barrett. Put aside the leveling down. That's a terminology issue. By leveling down, I meant collection remedy. We can call it leveling down. Whatever you want to call it, counsel, is fine by me. How do I do it? So in the tax context where the court's established that you can level up or level down, there's no rule that the court's judgment itself has to compel the actors. And I think there's a reason for that. Fine, fine, fine, fine. How does it happen? So the way it happens is that the B.A. administrators read this court's decision and they see that they are required to collect additional fees. Are they? They're not bound by anything. They're not parties to this case. But I think this court's declaratory judgment that— There's no declaratory judgment. It's just that Mr. Geisler loses. That's the particular judgment in this case. But as footnote 29 in Morales-Santana says— There's no judicial decree telling anybody. But even putting that aside, how practically are they going to do it? All right. So I'll get back to note 29 in Morales-Santana later. But as a practical matter, what happens is you send a collection notice to the reorganized— So I guess to start with the easiest cases, there are 10 open cases. Put those aside. But that's a third of the fee payment, and that would substantially close the gap. And in those cases, I do think there's a statutory obligation to pay under 1129. That's helpful. So I think that's a big chunk of it. But I think for the other cases, there is, in many of the cases, a reorganized debtor that still exists or an individual. To that individual, the B.A. administrators send a collection notice. We think many of them will be able to pay. A lot of the amounts at issue are just a few thousand dollars. We think a lot of those people will have the ability to pay and will pay. If not, it gets referred to the collection just like any other government debt. We admit that there are at least two cases, the liquidated cases, which represent a total underpayment of I think it's about $27,000, where it will not be collectible. And I think the good faith remedy in this case, and this Court has been clear in McKesson that perfection is not required. We'll have to accept that you're not going to be able to claw back those last pennies. Ms. Hansford, I'm wondering whether this isn't ‑‑ I read your brief and the arguments that you're making as though the collection remedy was sort of like your second option. That some of these problems that I ‑‑ concerns that I share and the problems that have been addressed are a reason why we wouldn't necessarily think that a retrospective remedy is appropriate. So it's precisely because going back and clawing this money from the BA districts that got a windfall before because they didn't ‑‑ weren't required to pay the higher amounts, because that's a little unfortunate and maybe difficult to do, why the government is saying really the best remedy here is to just look forward and say from now on, everybody has to pay the same fee. I think that's exactly right, Justice Jackson. We do think that to the extent the Court thinks retrospective relief is required, a meaningful, albeit not perfect, collection remedy can be executed. I think that the refund remedy would not be perfect and would leave in place a larger disparity. But wait, why would we think ‑‑ so why would we think that the retrospective ‑‑ there are three options here, right? It seems to me that ‑‑ not the petitioner, the respondent in this case is seeking a refund, which I understand is retrospective, but he wants a refund. That's one. The second is, I guess, leveling up by making sure that the people who in this window of time didn't get the amount or didn't pay the amount pay, and that's the clawback that we've been talking about. And then the third is recognizing that the government has changed its policy with respect to this, that everyone is now uniform, that we just go forward doing a uniform thing. So why would we ‑‑ what is the argument for doing a retrospective remedy? I think that you should not do a retrospective remedy. I completely agree. I think respondents' only argument that that's required is an idea that the Due Process Clause compels it because there wasn't pre‑deprivation relief here, and I don't think that's correct. But the reason that I agree with you, Justice Jackson, that perspective only relief makes the most sense here, is if you look at this, the disparity is so tiny, 2% of cases, about 1% of the total payments. Congress meant to collect $330 million. It collected 326 million of them because of the mistake it made, and so we're 99% of the way there. And just to be clear, I don't know how I feel. You said you agree with me. I don't know. I'm just trying to understand what the basis for saying we should do this retrospectively is. And so I think that one reason that perspective makes sense is because the disparity is so small and that you're not going to get to a smaller disparity by starting to give refunds. Yes, Mr. Geiser might be happy if his client gets $2.5 million, but as a constitutional matter, that will be a disparity of 6.3 million instead of a disparity of 3.8 overall. That's worse from the Constitution's perspective. If I can understand your argument, you acknowledge that this perspective only solution is one that depends on whether the party has been given a meaningful pre-deprivation remedy. Is that correct? Yes, that's correct. And others have brought up the fact that there are some people out there who actually took advantage of such a remedy. Yes. So would you be able to apply the prospective only solution to them? Or is this a prospective only for Mr. Geiser's client, but there are other people out there who you would have to acknowledge the prospective only doesn't work? So Justice Kagan, I think the better answer is that prospective only works for every single person, with the caveat I gave Justice Barrett that the people who invoked it are a small universe, so if you're worried about them, please don't let that drive the decision. The reason I think the answer is the same for everyone is the constitutional due process question is was there an opportunity for a pre-deprivation hearing? Now whether you invoked it or not. And the fact that they had the opportunity for a pre-deprivation hearing meant that they were able to get a hearing on this question, and as McKesson says in footnote 21, that's an additional safeguard that ensures that their property wasn't wrongfully taken. It wasn't here because they paid the right level of fees. What was wrong all along— I had thought of the McKesson line of cases as sort of a forfeiture doctrine. It's like we're not going to worry about you if you were given a pre-deprivation remedy, you didn't take it, you now arrive at the situation, we don't really care if you overpaid. But if you think of it that way, you couldn't make the answer that you gave, right? Yeah, that's right, Justice Hagan, and I'll take another stab at why I don't think of it that way, but again, if you want to say there is a requirement of a retrospective remedy or a refund for these five cases, we really don't have a big problem with that. That's not a big cost for the taxpayers. That's not a huge—it makes the disparity a little worse, but it's not a big deal. The reason that I don't think that it's a forfeiture doctrine is we just want to make sure—and almost always there's a pre-deprivation remedy. That's the hallmark of due process. The tax cases are unusual because of the special considerations there, and we just want to make sure that because we took away from you the option of getting a pre-deprivation hearing, you're no worse off. And I think that even those five debtors are no worse off because the right answer in their case was always you guys were paying the right amount. You are like the robocallers who are not collecting government debts. All along, you were supposed to pay the higher fees. The problem was some people were allowed to pay less, and the retrospective question is do we need to go back and fix that? I think there are a lot of good reasons we don't need to do that, but I think as this Court put it, for instance, in Collins v. Yellen, one way to think about the constitutional violation here is that the Constitution kind of preempted by its force from the outset this exception for the B.A. districts that said that the B.A. districts may be allowed to pay less. And if you think of it that way, the right rule all along was uniform fees at the higher levels, and there's no reason that anyone in that world should be paying fees at the lower levels that Congress emphatically did not intend. I guess I don't understand why the government is conceding what Justice Kagan said about the perspective-only remedy depending on whether there's been a meaningful pre-deprivation. I mean, I understand that comes from McKesson in the tax cases, but are those cases really on all fours with what's happening here? I could see a world – have we ever applied those cases and that concept outside of the tax scenario? I can't think of a time when this Court applied it outside of the tax scenario, but I do read those cases to stand for the more general proposition that if we don't give you a pre-deprivation hearing, you shouldn't be worse off before that. I think the reason, though, Justice Jackson, that you haven't applied it out of the tax context is because almost always there's a pre-deprivation hearing available, as there was here, and the reason that this issue and this constitutional requirement of perspective-only relief only comes up in that context is because the tax context is the situation where we think the government can prevent you from challenging first, getting a meaningful hearing first, and then arguing later. What about the perspective-only remedies in the Morales-Santana scenario, et cetera? Did that turn on whether or not there was a pre-deprivation hearing? Exactly. In that case, the Court didn't have to justify why I was allowed to do perspective-only relief, and in AAPC, this Court didn't have to justify why perspective-only relief were required. I think if we lived in Respondent's world, where almost always perspective-only relief was not an option, those cases could not have come out the way they did, because there's no reason that perspective-only relief would be constitutionally permissible in those cases, but not in this one. And I think, again, AAPC is a good example. If you start in that case with the premise that no matter what, you have to do retrospective relief, you then get to a place where you can't actually impose retrospective liability on the people who made government debt calls, because they wouldn't have enough notice. And then I think you would have to get to the opposite result in AAPC. You would have to say we sever the whole statute instead of just the exception, if you start with that premise. Thank you, Counsel. Justice Thomas? Justice Alito? Justice Kagan? Justice Gorsuch? Any further? Justice Kavanaugh? Justice Barrett? Justice Jackson? Thank you, Counsel. Mr. Geiser? Thank you, Mr. Chief Justice, and may it please the Court. Respondents are entitled to a refund for the unconstitutional fees paid under the 2017 Act. Under a century of this Court's jurisprudence, prospective-only relief is insufficient to redress a past monetary injury. If the government unlawfully collects funds, it is required to rectify that violation with meaningful, backward-looking relief. It cannot simply keep the unconstitutional fees and promise not to do it again. The government is also wrong that respondents somehow forfeited their rights by failing to invoke a pre-deprivation remedy. Under settled law, due process requires retrospective relief unless an exclusive pre-deprivation remedy is both clear and certain. The government cannot meet any of those conditions here, where the Code authorizes the same remedies and the same relief before or after payment. The government finally responds that if it can't simply keep the money, this Court, acting alone, should authorize what Congress has refused to do, implement a clawback program seeking 800% higher fees in administrator districts over a half-decade after the fact. This extreme proposal invites chaos in bankruptcy courts and promises an administrative morass. It is neither legally nor practically feasible, and there is zero indication Congress would endorse a severe retroactive imposition, just as Congress refused to apply the 2020 Act retroactively. The government has not identified any statutory authority for unleashing a massive fee campaign across two states, reopening closed and final cases, disturbing confirmed and consummated plans, and somehow overriding multiple provisions of the Bankruptcy Code. Even when construing an actual statute, this Court refuses to apply provisions retroactively unless the political branches have clearly confronted and accepted the acute costs in unmistakable language. It is stunning for the government to ask this Court, without a hint of authority from Congress, to impose this kind of profound retroactive cost on dozens of bankruptcies and hundreds or thousands of stakeholders across two separate states. That is a policy decision reserved for the political branches, and it is Congress's alone to make. I welcome the Court's questions. Would you elaborate a bit more on your pre-deprivation argument? Sure. So the pre-deprivation argument that we had a right or didn't have a right for pre-deprivation relief? Well, the argument is that if there is a pre-deprivation relief available, if pre-deprivation relief is available and you didn't take advantage of it, then you are hard-pressed to make the arguments that you're making now. And I'd like you to respond because the government seems to be of the view that your retrospective argument cannot survive because you did have that available. Sure. I'm sorry, Justice Thomas. So under this Court's cases, now it is true that McKesson and Harper suggested in cases where there was not both a pre-deprivation and a post-deprivation remedy that pre-deprivation relief might be enough. When that question was presented in both Reich and Newsweek, this Court couldn't have been clearer. It said that there has to be an exclusive pre-deprivation remedy, and the government concedes in this case that this remedy under the Code is not exclusive. Parties have the absolute right, and they've had it for a long time, where they can assert a challenge to the fees before or after the fact. The exact same remedies are available before and after the fact. No one is on notice, just looking to first principles, that they are forfeiting their right to challenge an unconstitutional fee unless they object in advance. That's exactly what was the core rationale of Reich and Newsweek. That is also the bait and switch. And it wasn't premised on the fact that there was an affirmative statute that says, we'll give you your fees after the fact. It was based on the fact that the government was saying in advance, if they want to rely on a pre-deprivation remedy to foreclose a post-deprivation remedy, that if you have a problem with this, this is your one and only time to raise it. The government can't say the Bankruptcy Code authorizes these challenges before or later, but in fact now we're deciding you should have done it before, even though there was absolutely no notice of that whatsoever. And I think Reich and Newsweek couldn't be clearer on that. But those cases had to do with raising the objection at all. Nobody stopped you from getting prospective relief. You've gotten the treatment of equality that you sought. You came in and said, I'm being treated unequally, and I want to be treated equally. And the government's saying, you're right. You were treated unequally. Now everybody has to pay the same fee. You don't like that answer, but you got a remedy. Those other two cases had to do with situations where you're being told, you're not going to be able to get the legal issue resolved. You're not going to be able to resolve the inequality at all. No, Justice Sotomayor. And to be very clear, Reich and Newsweek both ended by saying, we'll remand for the court, for the state in those cases, to provide meaningful backward-looking relief, consistent with the court's mandate in McKesson and Harper. And to also be very clear, in those cases they again said, the fact that there was a pre-deprivation remedy, and it was undisputed in those cases, that there was absolutely a pre-deprivation remedy. Had the parties invoked it, they would have been just fine. But there also was a post-deprivation option. Unless the state makes clear in advance, again, this is just fundamental due process 101. You have to make clear in advance, providing fair notice to a reasonable party, that if you don't invoke the remedy in advance, you're forfeiting something after the fact. The thing that I'm struggling with is understanding what difference it makes in this particular situation, whether you had a pre- or post-deprivation remedy, when it seems pretty clear that making that claim leads to the determination, not that you pay less, but that everybody pays more. Do you concede that that's Congress's intention, not only sort of initially, but also as reinforced in the legislation that it enacted after this problem came to light? Absolutely not, Your Honor. And just to be clear, if you agree with me that the solution, then, is either leveling up or leveling down, then I think that that would be agreeing that a prospective-only remedy is off the table, as I think it quite clearly is. Now, the question is, should you level up or level down? Now, the government has suggested that this is as simple as sending out 48 bills to— No, the government has suggested that it's Congress's intent that actually is what we should care about in making that determination. And so my question to you is, do you dispute that Congress wanted everyone to pay the higher fee? We dispute it. It's a yes and no answer, and if I could explain why. Okay. So it's, we don't dispute that if Congress could go back in time from day one, they're not faced with any retroactivity problems, they're not faced with the prospect of opening closed and final cases, disturbing final confirmation orders that are non-appealable at this point. Congress would have done this correctly if someone had tapped them on the shoulder and said, the 2017 Act has a flaw, you should fix this. But we definitely— And how they would have corrected it would, was not to lower everybody's fees to the B.A. level. How they would have corrected it would be to say everybody has to pay the higher fee. Absolutely, but that's not a choice Congress has today. Why is that not a choice they have today? Because Congress hasn't yet invented a time travel machine. They can't go back in time and say, we now will fix this in advance so we don't have this profound retroactivity problem. No, no, no. I guess I don't understand. I mean, back in the day, the problem was that the higher fee level that Congress implemented in the statute wasn't being applied to everyone. And I appreciate that it was being applied to your client. But you're asking now for a refund for that period of time so that the remedy is to make your client pay less and that's how we're going to make it equal. And I'm just saying, I don't see anything in the legislative history, in the way in which this entire scheme has developed that would suggest that that's what Congress would have intended. Well, I can do one better than legislative history because the 2020 Act said we're going to fix the problem and we're going to fix it prospectively only. That was Congress's determination. I don't see why that doesn't hurt you. You're asking for a refund. The government is saying yes, right. But no, but Your Honor, I think it helps us a lot. In the 2020 Act, Congress recognized that there is a problem that we need to fix. And even said in the preamble to the Act, and again, this isn't legislative history. This is in the Act itself. They said that the debtors in the administrative districts should have been paying this all along. And you'd expect then, if Congress were fine with retroactive implication, a retroactive clawback, the next sentence would be, and now they have to pay those fees. But Congress — No, so I take the point, Mr. Geiser, that what Congress really wanted was a prospective and don't bother us about the past. And that seems fair enough, and maybe it supports Ms. Hansford if there weren't a constitutional problem, which of course you say there is, as to the prospectivity. But as to the — let's put prospectivity aside, and you have to level by refund or level by collection. I forget which one is up and which one is down in this context. It seems really hard to figure out what Congress wanted, because it didn't know that everything was going to get messed up in this way. But we do know a couple of things, that Congress, back in the past, before everything got messed up, wanted higher and equalized fees. And we also know that Congress wants a program which is entirely self-funded and which does not impose burdens on the taxpayer. And when you put the former, which I agree is sort of like, well, back in the past, with the latter, which is continual, Congress never wants to impose burdens on the taxpayer with respect to bankruptcy. You know, it thinks that the people who use bankruptcy should pay for bankruptcy. Then it seems to me that there's a pretty strong case that Ms. Hansford says, that it should be equalization by collection. Well, Your Honor, I think then if that's true, then it's up to Congress to say that, and I think for a few reasons. The first is that that would be a retroactive imposition. We can disagree whether it's impermissibly retroactive, where it actually would be unconstitutional under the Due Process Clause to try that kind of remedy. But it is at least severely retroactive. And if it is, it would be extraordinary for this Court. I can't think of a single case where this Court had said in fashioning a remedy, it can ignore the fact that the remedy that the Court itself would be unleashing through a judge-made order, it has to make up this judge-made remedy, and then has to make up that that same judge-made remedy applies retroactively, which is strongly disfavored in the law. So I think that's one major obstacle. A second major obstacle is that the government's suggestion of just sending out bills to debtors is simply wrong. That's not the way bankruptcy works. And, in fact, the government's proposal would violate multiple sections of the Code. And they can't just wave away those violations. If Congress wants to set aside affirmative provisions of the United States Code and the Bankruptcy Code that bar the government's relief, then Congress can do that. But I don't think this Court can. I don't think this Court can authorize a remedy that's inconsistent with the Bankruptcy Code. And there are multiple provisions. I'm sorry. Why don't we care? Why do you care? I mean, you cared about being treated unequally. You're being told you'll be treated equally. That someone else may get a pass, why is that hurting you? Meaning that, as your opposing counsel pointed out, whether it was Morales-Santana, whether it was the robocall case, there were people who received benefits that they shouldn't have, and we took them. There were citizens who shouldn't have been citizens. There are people who made robocalls that shouldn't have been penalized. Some got a free pass and some got penalties. You're saying that due process requires that somehow because we're worried about someone else's rights, we shouldn't let the government at least try or order to try. Some of those people might be successful in saying I don't have to pay and some might not be. The courts below will figure that out. Your Honor, the reason that we care is that we're entitled to meaningful backward-looking relief, which this Court has made clear is not just saying we're going to, in theory, correct it. It has to apply it and enforce it. That's the words that McKesson used, playing off language that goes back a century in this Court's cases. So the government's told, now you go call back. I don't know how they're going to do it, and I don't know why we have to answer that question. Oh, I think you do, and if you don't, this is what's going to happen. They're going to try somehow, some way, I agree with Justice Gorsuch, I still have no idea how they're going to do this, to collect these funds from the Administrator District. They've got 10 big companies that are still in bankruptcy, 31 percent recovery. I have to tell you, on bad debt, 31 percent is a great recovery. But it's not so good when you're trying to equalize an unconstitutional scheme that's been imposed on the taxpayers. When McKesson suggested the possibility that a few people slipping through the cracks here and there might be enough, they didn't say that 35 percent of the people slipping through the cracks would be sufficient. Mr. Geiser, can I ask – oh, sorry. I was just going to ask you, back to this question about prospective and retrospective relief, and I'm not sure of the answer, this isn't a loaded question. Does it matter if the request was for equitable relief or injunctive relief versus money damages? I mean, it seems to me Justice Jackson asked earlier, do we have any cases outside of the tax context, and I wondered that too, you know, outside of the dormant commerce clause context or the tax context. But as I was sitting down with my law clerk and we were debating this, we were trying to figure out in many equal protection cases, which would be, you know, similar to the uniformity clause where you're talking about discriminatory treatment, the kind of relief sought is just to end the disparity moving forward and it's equitable relief that's sought, which seems to me a possible distinction between citizenship and those sorts of things. And here what you asked for is money. Does that matter? I don't know the answer to that question. I think it does matter in the sense that when you look at this Court's cases, you know, my very able friends, they would tell you if they had better authority than an immigration case where retroactive relief is precluded by the Constitution, and a robocall case where the party was seeking prospective-only relief. All of this Court's cases dealing with prospective-only treatment is because that's what the party asked for. So it was a very easy question for the Court, and this is where the language comes from when the Court says, well, what would Congress want? The Court is trying to conform the statute to meet the constitutional standard, and all they have to do is they're asking the same question today as they would have asked all the way going back to the beginning when the statute was originally passed. What would Congress have done at that moment had they known the right answer? That's a very different question when you have time that has passed. You have a constitutional exaction, which is an invalid fee that's been collected, and now we have to figure out how to provide meaningful backward-looking relief. And the tax cases, too, it's not Dormant Commerce Clause cases. They do involve basically disparate treatment. It's saying you're favoring in-state people over out-of-state people. I think it's a very close parallel to the uniformity problem, and some of this Court's cases also dealt with equal protection claims where someone was exacted some sort of money that – and it's not a windfall, and it's not a question of they should have paid it anyway. The point is that if Congress wants or a State wants someone to pay money, they have to do it under a constitutional scheme. And if they haven't done that, then their choices are either to level up or level down. And I agree the terminology is confusing. It's actually flipped back and forth at each stage of, I think, all of these cases that I know of. But in this case, a clawback remedy simply isn't an option. And I want to be very clear why that is. One is that there is a constitutional impediment to it. The administrator district debtors will have a solid due process claim that this is impermissibly retroactive. But they're not before us. Shouldn't we let them make that claim in the next case? Your Honor, then what will happen is if that claim succeeds, this case will somehow have to come back to this Court because it will turn out that, in fact, the government had one permissible option, providing a refund, because the clawback remedy doesn't work. But I think you can see right now, even from the former bankruptcy judge's brief, that even putting the constitutional concern aside, there are provisions of the bankruptcy clause that foreclose what the government wants to do. I mean, when they say they're just sending out a bill, they're not sending out a bill. They have to go into the bankruptcy case. They have to upset a final and non-appealable confirmation order. Right away, you're violating Section 1141 of the Bankruptcy Code. What if the government's answer is, we don't want to do that? Our solution is move on. And you're saying that's not constitutionally permitted, and I'm trying to understand why. For exactly the same reasons that the government's arguments should be familiar to this Court, because it's the exact argument that Florida made in McKesson and Harper. Florida said, we fixed the problem going forward. We promised not to do it again, and we would rather keep the taxes that we collected under this unconstitutional scheme. In fact, refunding them would just be a windfall to the favored class. And this Court said, that's not good enough. Under the Constitution, again, this is going back for over a century now, this Court's arguments. When the government exacts money that it's not allowed to have, it has to provide meaningful, backward-looking relief. Why do you say they're not allowed to have it, though, in this situation? I feel like you're conflating different legal frameworks, and that's where I'm getting confused. I thought you conceded that they could have the higher fee, that everybody agrees that the Congress wanted the higher fee. So what is it about this that they're not allowed to have? It's the exact same thing they're not allowed to have in an Equal Protection violation or Dormant Commerce Clause violation. No one in McKesson and Harper was saying that a state couldn't enact a tax that applies evenly to everyone. And the businesses that were objecting in that case would, in fact, have to pay it. But those businesses don't have to pay a fee that's been exacted under a constitutionally flawed scheme. I think that's settled under McKesson, Harper, going back to the 1920s, dealing with Montana National Bank and Bennett. You want perfection, though, in how this is all going to work out. But even under your approach, there's not going to be perfection, as the government details at length, because the refunds will not get to everyone. Well, first, we disagree with them. So if there's not perfection on the collection side, I understand it's not going to be 100 percent perfection. But it's not going to be perfection under your approach either. So a few responses to that. The first is... Not even close to perfection. Well, I mean, under the former bankruptcy judge's brief, they suggest there's a high possibility the government won't collect a single cent unless they can override and set aside the bankruptcy. That's for bankruptcy judges. I understand. I get it. But, you know, the government says they could get more. And we'll see. But talk about my question, which is about there's not going to be close to perfection under your approach either. Well, first, again, we're not sure about that. Normally, when it's very easy to give people money, while it can be very hard to take money from people, normally if there's a financial incentive, there's an easy way to collect it. There's a class action pending right now in the Court of Federal Claims. And I'm fairly confident that those lawyers who are fairly industrious will find a way to distribute the money. If they do get the money, which they will, they can distribute it to the plans. Almost every bankruptcy plan has provisions for what to do with assets that come into the plan after confirmation. That is just a settled, you know, component of a bankruptcy plan. So it's really as simple as looking up who is entitled to it, sending the check in, and it's distributed according to the plan terms. One other question, which is if the bankruptcy administrators in Alabama and North Carolina had followed the standing order and collected the proper fees back in 2018, you would have paid the same amount that you paid, correct? That would have eliminated the constitutional prejudice that we are currently suffering. You would have paid the same amount that you paid, correct? Yes. We would have paid the same amount, just as every single challenger, McKesson and Harper, and anyone objecting to a dormant commerce clause claim or an equal protection claim would have paid the same amount had Congress extended the benefits uniformly. But the fact is when they don't do that, that's where the problem arises. Now, I do want to provide another answer to Your Honor's question about, you know, what about the inability to get full refunds on our side? Now, again, we think it's going to be pretty close to 100% collection, but even if that's wrong, the provision of full relief entitles 100% of the injured class to collect. The only people at that point who wouldn't collect would be people who are voluntarily electing not to do it. So they would not suffer any constitutional prejudice. The constitutional prejudice is, in fact, cured in full by providing a full refund. That's the meaningful backward-looking relief. Then the court doesn't even have to worry how do we balance these two things. The entire injured class, anyone who wants to assert their rights, will be made whole by a refund. And the other point I'd like to make, too, is even if the court, and this goes somewhat to what does Congress really want here, the court could order a refund. And if my friends are right that there's actually no due process problem with asking people to pay money, you know, well over half a decade after the fact, and there's no problem with disturbing closed and final bankruptcy cases where bankruptcy puts a premium on finality, there's no problem with overriding a confirmed plan, a reorganization that is final and non-appealable, then Congress can pass a law tomorrow, the day after this Court's decision, that says, in fact, we don't want refunds. In fact, claw back those funds. And then my prediction is the debtors in the administrator districts will challenge out on due process grounds, and I believe they'll probably prevail. But at least at that point, it's Congress that's doing the work, instead of the government coming to this Court and saying, why don't you do what we didn't do? In 2020, Congress could have had a retroactive imposition. They refused to do that, presumably because they didn't want to take the political heat from the stakeholders in the administrator districts of imposing these fees after the fact. And, again, it's not as simple as bothering the debtors. And this also goes to other problems in the bankruptcy code. Well, Congress could have done it your way, too. Congress could have. They didn't. And they didn't. Presumably because it's $326 million, and they don't. That would be inconsistent with the usual principle that bankruptcy pays for itself. And there is a surplus in the United States trustee fund that could probably cover the majority, if not all, of what's owed. And if Congress is concerned about that, Congress can pass a new tax tomorrow that Florida made similar objections in McKesson and Harper. Florida said, we really have good uses for this money, and it's really going to hurt us if we have to give us back. It's actually going to create economic turmoil. And the Court's answer was, that's too bad. You pass an unconstitutional tax. You need to provide meaningful backward-looking relief. So you either have to stomach the political cost of imposing that tax retroactively on the favored class and deal with the political fallout, or you have to provide refunds. Those are your two constitutional – But the thing that's different, of course, here is that the only constitutional problem with this was an equality problem. And so it could be fixed either way. And as Justice Kavanaugh just said, everything we know about Congress not wanting to impose bankruptcy costs on taxpayers suggests that if it's at all possible, it should be done by collection. But I don't think that is everything we know because, again, Congress could have imposed that fee retroactively in 2020. It could have done either one. It didn't know it was having this problem. Now, you know, so this is a little bit of a constructive enterprise, granted. But we can apply to a constructive enterprise the things we know about how Congress funds bankruptcy. Sure, Your Honor. But normally, again, if this were an actual statute that just said, collect fees in administrator districts, this Court would not construe that statute to authorize a retroactive remedy, tacking on fees five years after the fact unless Congress spoke clearly and unmistakably. When even the Court in the Bowen case asked, does an agency have the general authority, just as a background matter, to apply statutes retroactively when a regulation is struck down for technical problems? They're basically trying to say, look, we goofed. We're going to do it right this time and cover the full period. This Court said the agency doesn't have that authority. So I think it's quite remarkable for the government to say that judges themselves who the Court is not politically accountable, if someone is upset when they're called, I hope they don't call, you know, the Chief Justice and say that we wish you hadn't done this. If Congress wants to pass this law, Congress can do it. And, again, if the government is confident. You're creating a conflict for the Chief Justice now. And just to be clear, I didn't do it. Can I ask you, how do you square your answer about the requirement of meaningful backward-looking relief in this situation with the cases like Morales-Santana where they didn't get backward-looking relief? Sure, Your Honor. There are literally two cases the government – actually, there are three because they tacked on one in their reply brief. And I'll start with that one first. But they are Supreme Court cases. They are. But the third one is the easiest. And I'll get to – the third one, the Manhart decision, is a Title VII case. It applies a statutory equity standard. And Title VII specifically says that retroactive remedies are not required. And the court had good reasons in that case not to require them. That is very different than the constitutional standard that does require it. In Morales-Santana, that is an immigration case where it was impossible to provide retroactive remedies. And the challenger in that case was seeking prospective relief. That challenger did not say – So is it just about what they ask for? Or is it about the possibility of getting it? Because there's a world in which what we're talking about here is how impossible it is to give a retrospective remedy in this case, either leveling up or leveling down. You've made very ably the argument for why it's impossible to do it retrospectively, leveling up. And Justice Kagan points to the argument about why it's impossible to do it retrospectively, leveling down, because it's inconsistent with the entirety of the bankruptcy scheme as Congress has laid it forward. So I guess I'm just trying to understand why we couldn't rely on something like Morales-Santana and the fact that if it's hard to do or impossible to do, then we can just go prospective. Well, Your Honor, I think that if you want to read something from Morales-Santana, it's that the government's theory of clawing back funds is not a permissible theory in this case. It's not an option they have because they need affirmative relief from Congress. Right. I'd like to read it broader. I'd like to read it broader than that to support the view that there's nothing unconstitutionally problematic about necessarily a prospective-only remedy. I think if this Court wanted to adopt that theory, it would have to affirmatively overrule Reich and Newsweek. It would really be picking a direct fight in a way that can't be squared with those cases, those cases made abundantly clear that unless there's an exclusive pre-deprivation remedy, the government has to provide meaningful, backward-looking relief. So, and again, when we look at the most direct... Have you dealt with all three of the government's cases yet? I have not. So I've dealt with Manhart, which is the one in the reply. We have Morales-Santana, where the Court specifically acknowledged there was a two-justice concurrence that said that because of the plenary authority of Congress over citizenship, the Court doesn't have the power to adjust citizenship looking backwards. It has to do whatever Congress has said in terms of whether citizenship is conferred or not. And the majority opinion didn't spell out that rationale. But if you look at the pages in the briefs, the party's briefs that they cite for this very point, it spells out exactly that rationale. And the third case is the robocall case, which with the greatest of respect was... We disagree with. Well, actually, I'm not even sure we do. The way I read the footnote in that case, and it was a single footnote. It didn't have any rationale or analysis. And the party's briefs barely did either. It was a single page. It was a single page of the party's briefs. And I look at the language in that footnote as reserving the question. It wasn't resolving it. It said that the result in this case does not lift the fines that have been imposed. It didn't necessarily say that if someone had brought that challenge, because, again, the petitioners, the challengers in that case, they didn't have any fines. Their contention was going forward, seeking perspective relief. We'd like to make these calls. And the court sensibly said, you're violating a general robocall provision that's been in place for decades. And so you can't do that. But that's very, very different. The fact that the government's relying on a case like that instead of cases involving an illegal exaction of money under a scheme that treats one class differently than another, it doesn't take a whole lot to say which one of these are more analogous. Thank you, counsel. Justice Thomas. Justice Leal. Justice Gorsuch. Justice Barrett. Justice Jackson. I just have one more little thing, which is I'm wondering if it matters that there are individual rights at issue in some of these equal protection cases. It seems to me that this uniformity constitutional provision that's at the forefront of Congress' power, and I guess you could say the same is true of the Commerce Clause, so I appreciate that. But is there something to the notion of we're not going to necessarily worry about a meaningful, backward-looking monetary remedy for a violation that is really about limiting Congress' power and has been remedied because Congress has changed the statute now and everybody's being treated equally going forward? So I think, Your Honor, you stole my first answer, which is that it is exactly the same as the other rights where the Court said you do have to provide meaningful, backward-looking relief. The second is that this is constraining Congress' authority, but it's constraining Congress' authority to protect individuals. It's so that certain debtors don't find themselves disfavored with respect to other debtors. So I do think there is an individual rights component to the right that's being protected. And now that we've paid that money under that unconstitutional scheme, if Congress wants to say tomorrow, to make this Court's job very easy, it could say Congress hasn't spoken. Normally, when the Court confronts these types of questions, it gives the State or the government a reasonable amount of time to respond. And when they don't, they say the injured party doesn't have to wait any longer. We're going to order a refund. Thank you. Thank you, Counsel. Rebuttal, Ms. Hansford. Thank you, Mr. Chief Justice. I want to start with Justice Barrett's question of whether what the parties ask for matters. I think both in Levin v. Department of Commerce and Morales-Santana footnote 29, the Court said that what the parties ask for does not circumscribe the relief offered. And parties never ask for the relief of the withdrawal of the benefit. And the fact that you're allowed to withdraw the benefit shows that you don't need to reward the successful challenger. That was the case in Morales-Santana. That was the case in AAPC. Neither one got the relief they wanted. And when this Court specifically addressed that and said they may be no better off, but that is not a problem. To address the Manhart case that my friend talked about, I do think that that is a great example of a case that was about money. There was a specific dispute as to whether money should be paid back. There was no question in that case that women paid too much into pension funds because they were women and were required for that reason to pay too much. And the Court said even in that circumstance, that's illegal. Title VII prevents it. There is a statutory presumption of back pay that the statute provides and still we're not going to award retrospective relief because this was probably a good faith mistake. There were reasons for it. And the financial impact nationwide would be too much. I think that reasoning applies a fortiori here because the Constitution does not provide that back pay should be allowed. It does not have a presumption of retrospective relief in this context. I would also point you to the Fulton case. That is a tax case. That's where the – I think what the Court normally does in cases when it benefits is does it prospectively. That's more comfortable. The exception to that is the tax context because it can't do it because of the due process overlay. And so Fulton is a case where there was no argument there was pre-deprivation relief. So it had to be retrospective. But the Court left open, whether it's level up, level down, in on remand, the Court did impose additional collections. On the argument that the CLAWBAC didn't work, I think as my friend's exchange with Justice Kavanaugh made clear, the refund also won't work. And if you think the Court needs to wait and see how well we do the collections, well, before giving my friend a refund, you need to wait and see whether we can actually successfully refund the $326 million. And until we get to $322 million, things are worse off from the Constitution's perspective because the Constitution is not like the False Claims Act forulators where there's a bounty for being a successful challenger. All the Constitution wants here is uniformity in one direction or another, and I think starting to give refunds might make the respondent happy, but it's not going to be a more constitutional solution. The last thing I would talk about is congressional intent. And my friend conceded that on day one what Congress would do is impose higher fees. But, of course, the reason that Congress didn't do it on day one is because my friend and others waited to bring these suits. My friend waited for two years after this was enacted to bring the suit. He could have brought the suit earlier. And Congress was incredibly proactive here. It responded to the body of lower court cases before they even reached this court, before the Siegel decision. If these suits had been brought on day one, Congress could have fixed them on day one. My friend never would have been subject to the disparate treatment of some B.A. debtors paying less. But he would not be financially any better off because, of course, his injury is not that he paid the $2.5 million in fees that Congress wanted him to pay. It's that these 48 debtors paid too little. Just one tiny factual point, which is my friend talks about how high this increase is, 800% higher. The fees were, oh, there was a 1% cap on the fee increase. So my friend's clients overpaid $2.8 million on a billion dollars in disbursements. This is a fee on the largest users who are best situated to bear this. So I guess I would just say that my friend's remedy of refunds would undo the 2017 Act, which was meant to protect taxpayers, and it would require them to pay hundreds of millions of dollars to reimburse the bankruptcy system's largest users. It flies in the teeth of congressional intent. It flies in the face of Congress's specific findings in the 2020 Act, which not only were that Congress always wanted these to be uniform, but also Sections 2A and 2B of the 2020 Act talk about Congress's specific intent, that the system be self-funded at no cost to taxpayers, and the idea that Congress would choose a refund remedy of undoing the 2017 Act flies in the face of congressional intent and the democratic process. We ask the Court to reject that approach and to reverse. Thank you. Thank you, Counsel. The case is submitted.